United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.G., | Case No.  19-cv-06691-JCS |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, SEALING DOCUMENTS, AND REMANDING TO STATE COURT** |
| CASTRO VALLEY UNIFIED SCHOOL DISTRICT, | |
| Defendant. | Re: Dkt. No. 76 |

## I.      INTRODUCTION

Plaintiff Enrico Giovannoni,[1] through his mother Carol Giavannoni as guardian ad litem, brought this action in state court against Defendant Castro Valley Unified School District ("CVUSD") and a number of unidentified "Doe Defendants," based on claims arising from Enrico having been assaulted by other students and CVUSD's purported failure to accommodate his disability while recovering from that assault.  CVUSD removed to this Court and now moves for summary judgment on Enrico's federal claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.  The Court held a hearing on September 17, 2021.  For the reasons discussed below, CVUSD's motion is GRANTED.

Because no federal claims remain, the Court declines to continue to exercise supplemental jurisdiction over Enrico's state law claims.  The case is therefore REMANDED sua sponte to the California Superior Court for the County of Alameda, where it was assigned case number HG19005460.

---

[1] Enrico was a minor when this case was filed, requiring the use of his initials in the case caption and early filings under Rule 5.2 of the Federal Rules of Civil Procedure.  Enrico has since reached majority and uses his full name in recent filings.  This order uses Enrico and Carol Giovannoni's first names for clarity, since they share the same surname.  No disrespect is intended.

As discussed in more detail below, the Court hereby SEALS sua sponte certain documents containing the names of individuals who were minors during the events at issue. The parties are ORDERED to file redacted versions of those documents no later than September 30, 3021.[2]

## II.    BACKGROUND

### A.    Factual Summary

This summary is provided for the convenience of the reader and is not intended as a complete recitation of the evidentiary record, much of which is not relevant to the outcome of the present motion. The facts are presented generally in a light favorable to Enrico. Nothing in this order should be construed as resolving any issue of fact that might be disputed.

Enrico was a student at Castro Valley High School from 2016 through 2020. Enrico Decl. (dkt. 79) ¶ 1. He loved sports and played them throughout most of his life, and he performed well academically for the first year and a half he was in high school. *Id.* ¶¶ 1, 3, 4, 6. His sophomore year, he played on the junior varsity basketball team. *Id.* ¶ 8. The head of the basketball program cursed at him and singled him out for criticism in front of other students. *Id.* ¶ 10.

On Friday, February 2, 2018, in the middle of Enrico's sophomore year, Enrico was in a locker room getting ready for a basketball game with his teammates, unsupervised by their coach. *Id.* ¶ 12. Some of Enrico's teammates took his bag, tossed it around, and took things out of it. *Id.* ¶ 13. When Enrico retrieved the bag, his teammates took it back again and continued. *Id.* One teammate wrapped his arms around Enrico to restrain him while another teammate took a sports drink out of the bag. *Id.* ¶ 14. Someone turned the lights off, and several of Enrico's teammates took his bag again, took out a protein bar, and threw it around. *Id.* ¶ 15. When Enrico tried to grab the bar back, a teammate grabbed him by the collar, slammed him into a locker, and punched him in the face. *Id.* Other teammates cheered, Enrico felt dizzy and in shock, and as his teammates left the room to start the game, one of them "told [Enrico] not to snitch and made a slicing gesture across his throat." *Id.* ¶ 16.

Enrico called his sister, who was at the game with their parents, and told her he had been

United States District Court
Northern District of California

---

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

2

injured and was near the locker room.  Carol Decl. (dkt. 80) ¶ 4.  Carol found Enrico in tears with the left side of his face "a little red," and he told her what happened.  *Id.* ¶ 5.  As they left to take him home, Carol told a security guard and an assistant principle, Yvonna Rogers, that Enrico had been assaulted.  *Id.* ¶ 6.  Carol monitored Enrico through the weekend.  *Id.* ¶ 7.  He suffered from "headaches and fuzziness as if [he] were in a fog."  Enrico Decl. ¶ 18; *see* Carol Decl. ¶ 7.

On Monday, February 5, 2018, Enrico was "sad," "quiet," and not "feeling right."  Johns Decl. (dkt. 78) Ex. D (Carol Dep.) at 82:10–13.  Carol wanted to take him to see his pediatrician, but was not able to reach that office, so she took him to the emergency room instead.  Carol Decl. ¶ 7; Enrico Decl. ¶ 18.  The doctor there, Dr. Feldman, told Enrico he had post-concussive syndrome and "couldn't participate in physical education, sports or exercise for five days," "could not perform contact sports for one to two weeks," and needed monitoring "for a worsening of symptoms."  Carol Decl. ¶ 8.  Carol emailed another assistant principal, Nic McMaster, that Enrico was not feeling well and would stay home that day.  *Id.* ¶ 10.  She emailed McMaster again the next day to say Enrico had post-concussive syndrome.  *Id.* ¶ 11.  McMaster responded that he would interview Enrico when he was feeling better.  *Id.*  Enrico stayed home from school that week, missing five days.  *Id.* ¶ 9; Enrico Decl. ¶ 19.

On Friday, February 9, 2018, Enrico saw his pediatrician, Dr. Stacia Cronin.  Enrico Decl. ¶ 20.  He was "still having headaches, fuzziness and inability to concentrate."  *Id.*  Dr. Cronin gave Enrico a concussion protocol for his classes and sports, which among other requirements, "called for extra time on tests and assignments."  Enrico Decl. ¶ 22; *see* Velasquez Decl. (dkt. 76-4) Ex. E.

When Enrico returned to school the following Monday, Carol informed the school about his headaches and provided a copy of Dr. Cronin's concussion protocol.  Carol Decl. ¶ 13.  No one asked if Enrico was okay or offered him resources or counseling, and he fell behind in his classes.  Enrico Decl. ¶¶ 25–27.  McMaster interviewed Enrico near the end of his first day back at school, and was looking into the incident, but he avoided Enrico in the halls after having previously been friendly with him.  *Id.* ¶ 24.  Enrico met the next day with his counselor, Elaine Dessus, and they discussed a plan to talk to his teachers to figure out how he could get back on track.  Gordon Decl.

United States District Court
Northern District of California

1    Ex. B (Enrico Dep.) at 86:23–88:12.

2           On Friday, February 16, 2018, Enrico saw Dr. Cronin again.  Carol Decl. ¶ 16; Enrico

3    Decl. ¶ 28.  Enrico and Carol understood Dr. Cronin's opinion after that visit as clearing him to

4    participate in non-contact track and field competitions, but as not disturbing the concussion

5    protocol with respect to academics, and Carol informed the school about the clearance.  Enrico

6    Decl. ¶ 28; Carol Decl. ¶ 16.  Dr. Cronin testified at her deposition that she believed Enrico "could

7    return to full activity" with respect to the symptoms of his concussion, but that "he did experience

8    setbacks in the schooling which . . . should be accommodated . . . like someone's been sick for a

9    while and you want to make accommodations for them to catch up."  Johns Decl. Ex. F (Cronin

10   Dep.) at 49:11–25.  The document Dr. Cronin provided was titled "PE Class/Sports/Exercise

11   Status Report," and noted that the "patient was evaluated and deemed able to return to PE

12   Class/Sports/Exercise at full capacity on 2/17/2018."  Johns Decl. Ex. G.  Enrico's counselor,

13   Dessus, understood the clearance as meaning he did not need academic accommodations, as did

14   CVUSD nurse Sandee Velasquez.  Johns Decl. Ex. H (Dessus Dep.) at 74:21–75:18; Velasquez

15   Decl. ¶ 12 & Ex. F.

16          Enrico continued to experience stress, anxiety, and headaches for the rest of his sophomore

17   year, but did not tell his teachers that he needed accommodations.  Enrico Decl. ¶ 29.  His inability

18   to concentrate and difficulty sleeping caused his grades to drop, particularly in math and

19   chemistry, and loud noises and bright lights bothered him.  *Id.* ¶¶ 35–36.  Enrico's counselor

20   noticed that his grades were declining after the February assault and attributed the decline to that

21   incident.  Johns Decl. Ex. H (Dessus Dep.) at 33:5–20.

22          Carol requested one-on-one tutoring for Enrico, "not being in a classroom with . . . other

23   kids or anything like that," but the school refused to provide tutoring.  Johns Decl. Ex. D (Carol

24   Dep.) at 172:22–173:10, 174:13–17; *see also* Johns Decl. Ex. A (Enrico Dep.) at 33:5–8 ("I sent

25   an e-mail, or my mom did, my sophomore year about getting an accommodation or a tutor or

26   something, but that was never -- nothing ever came of that.").  Carol states that she sought one-on-

27   one instruction "to make up for the subjects [Enrico] missed while out with his concussion" and

28   sought "structure for Enrico while he recovered," but "did not ask for remedial tutoring."  Carol

Decl. ¶¶ 37, 39.  She states that her requests that Enrico "be given more time on tests, quiet places to take tests, and more time to work on school work and assignments" were denied.  *Id.* ¶ 38.

In late February, Enrico took placement tests for AP U.S. History and Honors American Literature, but he was at a disadvantage for having missed time when other students were preparing, and he was not given testing accommodations.  Carol Decl. ¶¶ 19–20.  Carol contacted Dessus on March 7, 2018 to express concern that Enrico did not receive accommodations and her belief that he should be placed in the advanced classes.  *Id.* ¶ 21.

Enrico was in an advanced chemistry course, and his grade suffered because he missed a large amount of material during the week he was out of school.[3]  Enrico Decl. ¶ 34.  The school allowed him to transfer to a lower level course, but did not restore his grade to what it had been before the assault, despite Carol's request that the grade be restored.  *Id.*; Carol Decl. ¶ 25.

On March 20, 2018, Dr. Cronin provided a letter reading as follows:

> To Whom It May Concern,
>
> I recommended to Enrico and his mother that in the wake of his concussion and subsequent recovery that involved relative cognitive rest, that he reduce his academic load at school. The pressure and stress of the academic schedule was impeding his recovery. I am very happy that the family pursued lightening his load and that the school has accommodated this request. I can tell that the adjustment to his schedule has already helped to reduce his stress level and his recovery from the experience of the head injury/concussion.

Johns Decl. Exs. J, K.  According to Carol, Dr. Cronin recommended that day "that Enrico should reduce his academic workload because he was no longer progressing—he [was] regressing in his recuperation."  Carol Decl. ¶ 24.

One of Enrico's teachers emailed Carol on April 11, 2018 to say that Enrico had "been fading in [his] class a bit," had told the teacher he had lost interest, and was not prepared or sufficiently engaged.  Johns Decl. Ex. L.  The same day, Carol filed a form Uniform Complaint with CVUSD.  Gordon Decl. (dkt. 76-1) Ex. H.  The form provided boxes to check to indicate its

---

[3] Against the advice of his chemistry teacher, Enrico missed additional time in this class when he served as an outdoor school camp counselor for elementary school students a few weeks after he was assaulted.  *See* Gordon Decl. Ex. B (Enrico Dep.) at 98:2–20.

subject matter, including boxes for "Any forms of discrimination," "Special Education," and "Section 504." *Id.* Carol did not check any of the boxes provided, but instead wrote in and checked boxes for "student supervision," "student-athlete care and safety," "federal and state anti-bullying laws," and "CIF – rules."[4] *Id.* Most of Carol's narrative attachment to the form raised concerns about CVUSD's failure to prevent Enrico's assault, general failure to supervise and properly instruct athletes, and assignment of blame to Enrico. *See generally id.* One paragraph addressed academics, including a request for tutoring:

> The school's AP athletic administrator is directing my son's counselors to apply academic eligibility procedures under the CIF for return to academics as if my son should be punished for being bullied with some disciplinary actions. To the contrary, I believe that he has rights, that the school has to do everything in their abilities to help the victim of bullying and if tutoring is needed the school is required to offer/help in this regard. A victim of bullying and attack should be cared for in every respect in education. This is civil. The school's AP administrator is aware that my son is an athlete in Track and Field and it's importance to his academics now and into his future for college opportunities, and has indicated, in my view, a punishment approach to an actually academic need and need of support. I believe this is deliberate & misleading information given to a counselor, further harming my son. This violates one of the CIF's Mission of a Commitment, encouraging academic growth as a High Priority.

*Id.*

Dessus, Enrico's counselor, met with Carol on May 3, 2018, to discuss Carol's concern that Enrico was not admitted to an AP U.S. History class, and that his medical issues were not taken into account. Johns Decl. Ex. M. In internal CVUSD emails, Dessus noted that she "wasn't aware that he needed accommodations, there was no communication about need for one." *Id.* Another CVUSD employee, Kevin Batchelor, noted that Enrico "would have been enrolled in the class when we moved all students who scored 7s and submitted waivers into the class," but Enrico did not submit the form despite multiple reminders. *Id.* Carol followed up with Dessus on May 21, 2018 requesting copies of emails that would answer her questions about Enrico's non-placement in AP U.S. History. Johns Decl. Ex. Q.

On Friday, June 1, 2018, Carol emailed Enrico's chemistry teacher, Dr. Silvia Perri,

---

[4] The California Interscholastic Federation ("CIF") is a governing body for interscholastic sports.

United States District Court
Northern District of California

requesting a meeting.  Johns Decl. Ex. O.  Dr. Perri responded expressing concern that Enrico had fallen behind in the class and was not performing well—she had thought that his lack of engagement was due to having previously been in a more advanced course, but now realized he was struggling to keep up.  *Id.*  She said she was not available to meet that day but could meet the following Monday morning.  *Id.*  Carol responded that a Monday meeting was not "at all helpful for [her] son" because they needed to understand what work he should complete over the weekend, and that Dr. Perri should have contacted her sooner.  *Id.*

Enrico failed his math class his sophomore year.  Enrico Decl. ¶ 39.  His teacher gave him until the end of the year to finish his homework assignments, but did not waive any assignments, and when Enrico turned in all of the assignments at the end of the semester the teacher did not credit them towards his grade.  *Id.* ¶ 37.

On August 15, 2018, Carol called a CVUSD college counselor to say that Enrico was still experiencing headaches from his past injury and that she wanted his classes changed.  Johns Decl. Ex. P.  An internal CVUSD email from Assistant Principal Rogers noted that Enrico had asked to drop two AP classes because he did not know there had been summer homework to complete for them.  *Id.*  On August 24, 2018, Carol talked by telephone with Rogers and another CVUSD employee about Enrico not having been placed in an honors English course.  Johns Decl. Ex. N.  Enrico had been placed on the waitlist for that class based on the results of a placement test in late February.  *Id.*  Carol met with head counselor Allison Zuckerbrow at the beginning of Enrico's junior year registration period, told her that Enrico was still experiencing headaches, and asked if anything could be done for him.  Carol Decl. ¶ 45.  According to Carol, Zuckerbrow responded that Enrico "needed to be treated like every other student."  *Id.*

Enrico testified that his grades were "decent" his junior year, and while they were "not where [he] wanted them to be," he got all As and Bs.  Johns Decl. Ex. A (Enrico Dep.) at 30:6–15; Enrico Decl. ¶ 41.  He continued to experience "constant headaches" and "migraines a couple of times per week," which affected his academic performance, and received no academic accommodations.  Johns Decl. Ex. A (Enrico Dep.) at 30:22–31:16; Enrico Decl. ¶ 42.  He continued to be bothered by loud noises and bright lights.  Johns Decl. Ex. A (Enrico Dep.) at

31:8–12.  Enrico made no requests for accommodation to the school administration that year, but sometimes told teachers he had headaches and asked for extensions, and his teachers "only occasionally granted [those] requests."  *Id.* at 32:19–33:4; Enrico Decl. ¶ 43.  According to Enrico, he did not take AP classes because he was not given testing accommodations.  *Id.* ¶ 44.  Enrico saw a chiropractor to try to help manage his headaches.  Carol Decl. ¶ 48.

Enrico's headaches were worse his senior year, and he fell asleep in class regularly because he was unable to sleep well at night.  Enrico Decl. ¶ 46.  He did not take advanced classes.  *Id.*  Carol told a number of CVUSD employees that year about Enrico's headaches and "continued to ask for accommodations but they were denied"; she was told "that there were not resources available."  Carol Decl. ¶ 50.

After he graduated, Enrico was diagnosed with migraines in November of 2020, and continues to live with migraines.  Enrico Decl. ¶¶ 50–51.  He is currently enrolled in junior college.  *Id.* ¶ 49.

### B.    Procedural History and Claims Asserted

Carol initially filed this action on Enrico's behalf pro se in the California Superior Court for the County of Alameda on February 4, 2019, when Enrico was a junior at Castro Valley High School.  Notice of Removal ¶ 1 & Ex. A.  CVUSD was not sure whether Carol was seeking to assert any federal claims, and filed a demurrer on the basis that Carol could not represent Enrico without an attorney, which the Superior Court sustained.  *Id.* ¶¶ 3–4 & Exs. C, D.

After retaining counsel, Enrico filed his operative first amended complaint on October 4, 2019, when he was a senior at CVUSD.  *Id.* Ex. E ("FAC").  The first amended complaint asserts the following claims: (1) negligence; (2) negligent infliction of emotional distress; (3) negligent hiring, training, and retention; (4) violation of California's Unruh Civil Rights Act based on disability discrimination; (5) violation of Title II of the ADA; and (6) violation of Section 504 of the Rehabilitation Act.  *Id.*  Enrico alleges in his amended complaint that, "[a]s part of his reasonable accommodation, [he] sought additional instruction, tutoring, and a quiet place to take tests which [sic] limited distraction and stimuli, among other requests," and that CVUSD "employees did not assist him or arrange for these accommodations."  FAC ¶ 27.  He alleges that

8

United States District Court
Northern District of California

1    "[t]he only assistance he was offered was additional time to make up assignments he missed," and

2    that CVUSD "did not offer him other requested accommodations such as quiet places to take tests,

3    tutoring or meetings with instructors to discuss other possible accommodations." *Id.* ¶ 29.

4    CVUSD answered that complaint and removed to this Court on October 18, 2019 based on

5    Enrico's assertion of federal claims.

6           On May 21, 2021, after fact discovery had closed, CVUSD moved for judgment on the

7    pleadings on Enrico's ADA and Section 504 claims under Rule 12(c) of the Federal Rules of Civil

8    Procedure, arguing that Enrico had failed to exhaust administrative remedies under the IDEA. *See*

9    Mot. for J. on the Pleadings (dkt. 59).  CVUSD also moved for sanctions.  Mot. for Sanctions (dkt.

10   60).  The Court denied both motions based on Ninth Circuit authority holding IDEA exhaustion to

11   be an affirmative defense generally inappropriate for resolution on the pleadings.  Order Denying

12   Mot. for J. on the Pleadings (dkt. 74)[5] (citing *Albino v. Baca*, 747 F.3d 1162, 1169, 1171 (9th Cir.

13   2014) (en banc)).  CVUSD filed its present motion for summary judgment on July 30, 2021, and

14   the Court held a hearing on September 17, 2021.

15          **C.    The Parties' Arguments**

16          As in its motion for judgment on the pleadings, CVUSD contends that it is entitled to

17   summary judgment on Enrico's federal claims, under the ADA and Section 504, because Enrico

18   failed to exhaust administrative remedies under the Individuals with Disabilities Education Act

19   ("IDEA").  Mot. (dkt. 76) at 13–22.  According to CVUSD, since Enrico sought accommodations

20   related to instruction, including individual tutoring, the gravamen of his claims falls within the

21   scope of the IDEA and exhaustion was required.  *Id.* at 17–19.  CVUSD argues that no exception

22   to exhaustion applies because the school advised parents of their rights under the IDEA, Carol

23   filed a form complaint form with the school that had boxes available to indicate concerns

24   regarding special education or accommodation of disability (which she did not check), and Enrico

25   was represented by counsel in this action at a time when he was still in school and the statute of

26   limitations to bring an IDEA administrative complaint had not expired.  *Id.* at 19–22.

27

28   [5] *E.G. v. Castro Valley Unified Sch. Dist.*, No. 19-cv-06691-JCS, 2021 WL 2940191 (N.D. Cal.
     June 22, 2021).

United States District Court
Northern District of California

Enrico does not argue that he exhausted any claims under the IDEA or that exhaustion should be excused. *See* Opp'n (dkt. 77) at 19 ("It is undisputed that plaintiff never sought a due process hearing under the IDEA."). Instead, he contends that he was not required to exhaust administrative remedies because he was not seeking a "Free and Appropriate Public Eduction" ("FAPE") as defined by that statute. *Id.* at 14. Enrico notes that a FAPE as defined by Section 504 is distinct from a FAPE as defined by the IDEA, and argues that the accommodation he sought is best characterized as "access to regular education," which is governed by Section 504, as opposed to "special education" governed by the IDEA. *Id.* at 15–16. Enrico contends that the gravamen of his claim is based on denial of relief similar to alternative quiet test locations and extra time, which the Ninth Circuit has held do not require IDEA exhaustion, and that it is equivalent to accommodations that could be provided by non-school entities like libraries or standardized test centers. *Id.* at 17–18 (citing *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 907 (9th Cir. 2020)). He also contends that the relief he seeks here—"damages for emotional distress, mental anguish, and humiliation"—is not available under the IDEA. *Id.* at 17, 21–22.

CVUSD argues again in its reply that Enrico's request for individualized instruction and tutoring falls within the scope of the IDEA, and that *McIntyre* stands for a rule that accommodations related to "instruction" require exhaustion. Reply (dkt. 81) at 1–2, 5–7. He argues that a decision from this district, affirmed by the Ninth Circuit, held that claims for damages require exhaustion if the damages arise from failure to provide a FAPE under the IDEA. *Id.* at 7–10. CVUSD notes in its reply that Enrico's counsel had previously indicated Enrico would pursue an argument that exhaustion was excused by CVUSD's purported failure to inform Carol and Enrico of the exhaustion requirement, but no such argument appears in Enrico's opposition brief. *Id.* at 1.

CVUSD also argues that Enrico cannot show intentional discrimination or deliberate indifference because its employees in fact provided some accommodations for his disability, the school received a note from Eric's doctor clearing him for full participation, concussion tests with the school athletic trainer showed no symptoms, and Enrico's own doctor did not believe he was disabled. Mot. at 23–25; Reply at 10–15. Enrico contends that the record can support a finding of

10

United States District Court
Northern District of California

1   deliberate indifference because CVUSD should not have interpreted a note clearing him for

2   participation in athletics as indicating no further need for academic accommodations, teachers and

3   administrators were aware of his declining academic performance, and CVUSD provided no

4   accommodations during his junior and senior years when he continued to suffer adverse effects

5   from his sophomore-year concussion.  Opp'n at 22–25.

6   **III.     ANALYSIS**

7        **A.     Legal Standard**

8        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

9   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

10  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

11  the absence of a genuine issue of material fact with respect to an essential element of the non-

12  moving party's claim, or to a defense on which the non-moving party will bear the burden of

13  persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

14       Once the movant has made this showing, the burden then shifts to the party opposing

15  summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.*

16  (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

17  disputed must support the assertion by . . . citing to particular parts of materials in the record

18  . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

19  substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v.*

20  *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

21  identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan*

22  *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the

23  record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F.*

24  *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

25       A party need not present evidence to support or oppose a motion for summary judgment in

26  a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

27  to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.

28  2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

**B.   IDEA Exhaustion**

While Enrico does not bring a claim under the IDEA in this case, a provision of that statute requires exhaustion of the IDEA's administrative remedies "before the filing of a civil action under [the ADA or Rehabilitation Act] seeking relief that is also available under this subchapter." 20 U.S.C. § 1415(*l*).

**1.   Seeking Damages Does Not Excuse Exhaustion**

Enrico's argument that the exhaustion rule does not apply because he seeks monetary damages for emotional distress has some appeal. IDEA exhaustion is required only where a plaintiff "seek[s] relief that is also available under" the IDEA, 20 U.S.C. § 1415(*l*), which does not provide for emotional distress damages, *see Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 752 n.4 (2017). The Supreme Court has declined to decide whether seeking such relief exempts an ADA or Section 504 claim from the exhaustion requirement. *Id.*

The Ninth Circuit, however, has held that in addition to more straightforward examples of a claim under the IDEA itself or for relief under another statute identical to that which could be awarded under the IDEA, "exhaustion is required in cases where a plaintiff is seeking to enforce rights that arise as a result of a denial of a free appropriate public education, whether pled as an IDEA claim or any other claim that relies on the denial of a FAPE to provide the basis for the cause of action (for instance, a claim for damages under § 504 . . . premised on a denial of a FAPE)." *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 875 (9th Cir. 2011) (en banc), *overruled on other grounds by Albino*, 747 F.3d 1162; *see also id.* at 882 ("If, however, the 'emotional distress' stems from Payne's concern that D.P. was not receiving an adequate education, then exhaustion is required."). The Ninth Circuit has reaffirmed that rule in recent years. *See Paul G. v. Monterey*

*Peninsula Unified Sch. Dist.*, No. 16-cv-05582-BLF, 2018 WL 2763302, at *8 (N.D. Cal. June 8, 2018), *aff'd*, 933 F.3d 1096 (9th Cir. 2019); *K.D. ex rel. Carrera v. L.A. Unified Sch. Dist.*, 816 F. App'x 222, 224 (9th Cir. 2020) ("K.D. also argues that exhaustion would be futile because she seeks monetary damages—which are not available under the IDEA administrative process. We rejected this argument in *Paul G.* . . . where, as here, the damages sought were based on an alleged failure to provide a FAPE."). This Court is bound by that rule.

Several of the cases Enrico cites on this point are inapposite. *See* Opp'n at 21. The damages at issue in *Langley v. Guiding Hands School, Inc.* "apparently relate[d] to Plaintiffs' alleged physical and emotional injuries caused by the use of restraints," not to denial of instructional accommodations. *Langley*, No. 2:20-cv-00635-TLN-KJN, 2021 WL 1212713, at *6 (E.D. Cal. Mar. 31, 2021). The Ninth Circuit's decision in *Mark H. v. Lemahieu* declined to hold that the availability of relief under the IDEA foreclosed damages under § 504 where the plaintiffs "*did* exhaust the IDEA administrative remedies." 513 F.3d 922, 935 & n.11 (9th Cir. 2008) (emphasis added). Enrico accurately quotes *A. A. P. v. Sierra Plumas Joint Unified School District* as stating that "'emotional, general, and punitive money damages . . . [are] not available under the IDEA,'" but both *A. A. P.* and the unpublished Ninth Circuit decision it quotes for that statement concerned whether a plaintiff could recover damages under the IDEA, not whether exhaustion was required when, as here, a plaintiff sought damages under another statute. *See A. A. P.*, No. 2:19-cv-00882-TLN-CKD, 2021 WL 847812, at *8 (E.D. Cal. Mar. 5, 2021) (quoting *Russell v. Dep't of Educ.*, 377 F. App'x 595, 596 (9th Cir. 2010)).

Two cases actually held in a manner that might support Enrico's arguments here. The Eastern District of California's decision in *McElroy ex rel. McElroy v. Tracy Unified School District* predated *Payne* and relied on precedent that *Payne* later overruled. *McElroy*, No. 2:07-cv-00086-MCE-EFB, 2008 WL 5045952, at *4–5 (E.D. Cal. Nov. 21, 2008). That case stated that "since such damages are not available under the IDEA, administrative exhaustion of such claims is not even required," *id.* at *4, which is inconsistent with *Payne*'s subsequent holding that "a claim for damages under § 504 . . . premised on a denial of a FAPE" requires exhaustion, 653 F.3d at 875. *McElroy* is therefore not an accurate statement of current law.

United States District Court
Northern District of California

1   In *H.W. v. Long Beach Unified School District*, the Central District of California had

2   difficulty squaring *Payne*'s rule that claims arising from denial of a FAPE require exhaustion with

3   its adoption of a "relief-centered approach," overruling earlier precedent that used an "injury-

4   centered approach. *See H.W.*, No. CV 10-07015 JGB(EX), 2013 WL 12242009, at *8–9 (C.D.

5   Cal. May 3, 2013). That case made much of the fact that an earlier decision that *Payne* overruled

6   had required exhaustion where a "student and her parents sought money damages to compensate

7   them for 'emotional distress, humiliation, embarrassment, and psychological injury'" caused by

8   the school district "regularly removing her from the classroom in order to be 'peer-tutored'

9   without the supervision of a certified teacher." *Id.* at * 9 (quoting *Robb v. Bethel Sch. Dist. No.

10  403*, 308 F.3d 1047, 1048 (9th Cir. 2002)). To redress that perceived conflict, *H.W.* interpreted

11  *Payne* as holding that claims for damages only require exhaustion where "the emotional distress is

12  caused by deprivation of educational services and can be *entirely* remedied through the provision

13  of educational services," and went on to hold that exhaustion is not required "where denial of a

14  FAPE is the underlying basis for all claims, but where distinct injuries arise from that denial and

15  where the plaintiff seeks relief specific to those distinct injuries"—as with "emotional distress,

16  pain, and suffering that Students allegedly endured after being alienated from the education

17  system." *Id.* As far as this Court is aware, no subsequent decision has followed that holding.

18  This Court respectfully disagrees that any such rule can be found in *Payne* or that *H.W.*'s standard

19  of "distinct injuries" creates a workable test.

20   Under *Payne*, exhaustion is required where a claim for damages "relies on the denial of a

21  FAPE to provide the basis for the cause of action." *Payne*, 653 F.3d at 875. Here, Enrico has not

22  identified any basis for emotional distress damages under the ADA or Section 504 except the

23  denial of accommodations. The question, then, is whether the accommodations he sought were

24  available as a FAPE under the IDEA.

25   **2.      Enrico Sought Relief Available Under the IDEA**

26   The exhaustion rule "hinges on whether a lawsuit seeks relief for the denial of a free

27  appropriate public education." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754 (2017). "What

28  matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside

any attempts at artful pleading. . . . In short, the IDEA guarantees individually tailored educational

services, while Title II [of the ADA] and § 504 promise non-discriminatory access to public

institutions." *Id.* at 755–56.

> One clue to whether the gravamen of a complaint against a school
> concerns the denial of a FAPE, or instead addresses disability-based
> discrimination, can come from asking a pair of hypothetical
> questions. First, could the plaintiff have brought essentially the same
> claim if the alleged conduct had occurred at a public facility that was
> not a school—say, a public theater or library? And second, could an
> adult at the school—say, an employee or visitor—have pressed
> essentially the same grievance? When the answer to those questions
> is yes, a complaint that does not expressly allege the denial of a FAPE
> is also unlikely to be truly about that subject; after all, in those other
> situations there is no FAPE obligation and yet the same basic suit
> could go forward. But when the answer is no, then the complaint
> probably does concern a FAPE, even if it does not explicitly say so;
> for the FAPE requirement is all that explains why only a child in the
> school setting (not an adult in that setting or a child in some other)
> has a viable claim.

*Id.* at 756.  As an example of a claim clearly preempted under that test, the Supreme Court offered

"a student with a learning disability su[ing] his school under Title II for failing to provide remedial

tutoring in mathematics," noting that it would be difficult to "imagine the student making the same

claim against a public theater or library," or "an adult visitor or employee suing the school to

obtain a math tutorial."  *Id.* at 756–77.

The Ninth Circuit's recent decision in *McIntyre v. Eugene School District 4J*, 976 F.3d 902

(9th Cir. 2020), interpreted *Fry* as holding that "to require exhaustion, a lawsuit must seek relief

for the denial of FAPE *as defined by the IDEA*," as distinct from the "'overlapping but different'"

requirements for a FAPE under Section 504 of the Rehabilitation Act.  976 F.3d at 913 (quoting

*Lemahieu*, 513 F.3d at 925) (emphasis added).  The panel noted that the IDEA requires

"development of an individualized education program" ("IEP") for the specific purpose of "special

education" in order to provide a FAPE, *id.* at 910–12, while Section 504 permits a FAPE to be

provided either through an IEP under the IDEA or through a written "504 plan" identifying

appropriate accommodations, which can facilitate "'regular *or* special education' that meet certain

standards."  *Id.* at 911–12 (quoting 34 C.F.R. § 104.33(b)(1)) (emphasis added in *McIntyre*).

The plaintiff in *McIntyre* had asked her school to: "(1) provide an alternative, quiet

location to take exams, (2) provide extra time to complete exams, and (3) comply with an emergency health protocol." *Id.* at 914.  In the Ninth Circuit's view, "[t]hese accommodations cannot be construed as 'special education,' because they do not provide 'specially designed instruction.'" *Id.* (quoting 20 U.S.C. § 1401(29)) (emphasis added in *McIntyre*).  In a long string citation, the panel elaborated on the meaning of "special education":

> *See* 34 C.F.R. § 300.39(b)(3) ("Specially designed instruction means adapting . . . the content, methodology, or delivery of instruction . . . ."); *Fry*, 137 S. Ct. at 755 ("[T]he [IDEA's] goal is to provide each child with meaningful access to education by offering individualized instruction . . . ."); "Instruction," Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/instruction ("[T]he act of teaching someone how to do something."); *see also* Robert A. Garda, Jr., *Untangling Eligibility Requirements Under the Individuals with Disabilities Education Act*, 69 Mo. L. Rev. 441, 486–87 (2004) ("[N]ot all services provided by schools to disabled students are special education. A child with Attention Deficit Disorder ("ADD") may need preferential seating and the use of a word processor, but not special education." (citations omitted)); *cf. L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004–06 (9th Cir. 2017) (holding that "one-on-one direction," "specially designed mental health services," and a behavior specialist's "extensive clinical interventions" constitute "special" rather than "general" education).

*Id.* (alterations in original).  The panel specifically rejected the school district's characterization of the complaint in that case as indicating "that McIntyre sought 'one-on-one special education,'" noting that the plaintiff actually alleged the district *offered* that relief—which the plaintiff never sought—as an alternative to one of her courses rather than stopping a teacher's discrimination and harassment and requiring him to follow her 504 plan.  *Id.* at 915.

Here, in contrast, Enrico (or Carol, on his behalf) sought individualized instruction or tutoring, outside of his regular classes and distinct from services offered to all students.  Johns Decl. Ex. D (Carol Dep.) at 172:22–173:10, 174:13–17; Carol Decl. ¶ 37; Johns Decl. Ex. A (Enrico Dep.) at 33:5–8; Gordon Reply Decl. (dkt. 81-1) Ex. A (Enrico Dep.) at 101:4–102:21. His complaint makes clear that the denial of such tutoring is one of the primary grounds for his failure-to-accommodate claims.  *See* FAC ¶¶ 27, 29.  Such individualized instruction is the paradigmatic example of an accommodation under the IDEA.  *See Fry*, 137 S. Ct. at 756–57. While special instruction to cover material missed while a student was home recovering—which

United States District Court
Northern District of California

Enrico contends is what he sought here—is somewhat different from special instruction to supplement regular instruction that is unsuitable or insufficient for a particular student, it is still a means of "adapting . . . the content, methodology, or delivery of instruction."  *See McIntyre*, 976 F.3d at 914 (quoting 34 C.F.R. § 300.39(b)(3)).  Enrico cites no case holding that a request for individual tutoring to accommodate a student's disability, whether to make up for missed lessons or otherwise, falls outside the scope of the IDEA and its exhaustion requirement.

In *E. K. v. Redondo Beach Unified School District*, a case on which Enrico relies,[6] the court characterized the following proposed accommodations as an offer for an IEP under the IDEA for a student with attention-deficit/hyperactivity disorder:

> In an effort to work with Parents, the District agreed to find Plaintiff eligible for special education and related services under the primary eligibility category of Other Health Impairments ("OHI"). The team developed three annual goals, each goal specifically addressed managing homework. The District offered specialized academic instruction in the form of the LSM [i.e., "learning skills management"] class to meet Plaintiff's executive functioning needs. The District also offered counseling services to address Plaintiff's social emotional needs, 30 minutes per session, twice monthly. The LSM class met three times a week and the class sizes range between five and fifteen students. The IEP also included preferential class seating, extended time on assignments up to one block period, allowing Plaintiff to email late assignments, shortened/reduced assignments when work is repetitious, and extended time on standardized test, including the option to take tests in alternate settings when requested.

*E. K.*, No. CV 20-01397 CBM(KSX), 2021 WL 3193227, at *8 (C.D. Cal. Apr. 14, 2021) (footnote omitted).  The nature of the LSM class was disputed, but the court (and the administrative law judge whose decision was on review) relied on testimony that class consisted of activities and lessons to build executive functioning skills, followed by a period of time that

---

[6] Enrico cites *E. K.* for its discussion of the criteria for a "specific learning disability" under the IDEA, Opp'n at 16–17, but identifies no authority holding those criteria relevant to the question of exhaustion, which was not addressed in *E. K.*  He also stops short of arguing that he did not meet those criteria at the time he sought accommodations, does not explain the "seven designated academic areas" in which a discrepancy in ability and achievement can be relevant under the California Education Code to determining whether a "specific learning disability" is present, *see E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Off. of Admin. Hearings*, 652 F.3d 999, 1003 (9th Cir. 2011) (citing Cal. Educ. Code § 56337), and omits the fact that a "specific learning disability" is only one of several potential bases for establishing disability under IDEA regulations, with "traumatic brain injury" being another alternative, *see* 34 C.F.R. § 300.8(a)(1).

students could use as they liked, including for access to teachers.  *Id.*  The *E. K.* decision did not consider the question of exhaustion, but instead was a de novo review of an administrative law judge's decision finding that the school district had offered the plaintiff an appropriate IEP.  Its treatment of the LSM course as a component of an IEP available under the IDEA nevertheless tends to suggest that the additional instruction Enrico sought here, as part of his mother's effort to secure "structure . . . while he recovered," Carol Decl. ¶ 39, similarly falls within the scope of the IDEA.

In *McIntyre*, the Ninth Circuit held that the student's request for testing accommodations, implementation of an emergency health protocol, and relief from a hostile work environment were comparable to accommodations that might be required of non-scholastic facilities.  *Id.* at 915–16. The panel noted that testing is not limited to schools, and that similar accommodations of additional time and a quiet location might be required of "a variety of entities that offer professional licensing and credentialing exams," or of an employer that "used any sort of eligibility exam for its employees."  *Id.*  Here, Enrico argues that the same applies to his requests for testing accommodations, and that an accommodation of "one-on-one instruction . . . is perfectly conceivable in a setting such as a library," where a "librarian could certainly instruct a student one-on-one regarding how to conduct research," or for an adult employed by the school, because "additional training in subjects in the workplace is a reasonable accommodation."  Opp'n at 19.  Perhaps so, but the Supreme Court disagreed in *Fry*, addressing the hypothetical accommodation of math tutoring as follows:

> But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE, thus bringing § 1415(*l*) into play.

137 S. Ct. at 757.  Stretching the test of whether a non-school facility might be required to provide the same accommodation to remove even individualized instruction from the scope of exhaustion would render it meaningless, and *Fry*'s discussion of tutoring makes clear that was not the Supreme Court's intent.

United States District Court
Northern District of California

1    While some of the particular accommodations at issue here are comparable to the testing

2    accommodations in *McIntyre* that the Ninth Circuit held did not require exhaustion, in this case

3    they were components of a "comprehensive," FAC ¶ 27, remedial program that Carol and Enrico

4    sought—including not only additional time, but also individual tutoring, excusing assignments and

5    placement tests, altering grades, changing courses, and closely coordinating with a student's

6    mother on his progress and difficulties.  Taken together, such relief would be available as an IEP

7    under the IDEA.

8    At the hearing, Enrico's counsel raised two arguments not squarely presented in briefing:

9    that the tutoring he sought for missed classes was not accommodation of a disability, and that his

10   claims should be permitted to proceed based on his requests for extra time to complete

11   assignments during his junior and senior years even if not based on the more comprehensive

12   accommodations he sought during his sophomore year.  Neither is persuasive.  Disability under

13   the IDEA includes "traumatic brain injury" that causes a need for "special education."  *See* 34

14   C.F.R. § 300.8(a)(1); *see also id.* § 300.8(c)(12) (defining "traumatic brain injury").  To the extent

15   Enrico's concussion caused cognitive symptoms and required him to stay home from school,

16   which in turn required later individual tutoring in lieu of the regular classes he missed, it meets

17   that definition.  Enrico's position that the tutoring he sought was not an accommodation of

18   disability also directly contradicts his operative complaint.  FAC ¶ 27 ("As a part of his reasonable

19   accommodation, [Enrico] sought additional instruction [and] tutoring . . . ."); *id.* ¶ 29.  As for the

20   question of whether accommodations Enrico sought at different times should be considered

21   separately, his counsel conceded at the hearing that she had found no case taking that approach,

22   and his first amended complaint frames his claims as based on failure to provide a "comprehensive

23   plan that would allow E.G. to get back on track and that would reasonably accommodate the

24   disability he now suffered."  *Id.* ¶ 27.  Consistent with all caselaw of which this Court is aware, the

25   Court considers the "comprehensive plan" that Enrico sought as a whole in determining whether

26   exhaustion was required.

27   One other consideration that the Supreme Court identified as potentially relevant in *Fry* is

28   whether "the history of the proceedings"—and in particular, "a plaintiff ha[ving] previously

19

invoked the IDEA's formal procedures to handle the dispute"—indicates that a plaintiff viewed their claim as falling within that statute's scope before changing course for strategic reasons. 137 S. Ct. at 757. Enrico is correct that this consideration does not weigh against him, as there is no evidence that he ever initiated IDEA proceedings. That said, the Supreme Court did not suggest that such abandoned administrative efforts are a necessary prerequisite to requiring exhaustion, and nothing in the language of 20 U.S.C. § 1415(*l*) indicates that exhaustion is only required where a plaintiff made incomplete efforts to do so.

Enrico's claims for failure to accommodate his disability under the ADA and Section 504 rest on accommodations intrinsically related to specialized instruction that could have been available under the IDEA. His federal claims therefore "rel[y] on the denial of a FAPE," and required exhaustion under the IDEA. *See Payne* 653 F.3d at 875, 882. Because there is no dispute that Enrico did not exhaust those remedies, and no argument that he should be excused from doing so, CVUSD is entitled to summary judgment on these claims.

## IV.    RULE 5.2

Among other privacy protections, Rule 5.2(a) of the Federal Rules of Civil Procedure requires that minors may only be identified by their initials in public filings in federal civil litigation. After an initial error in the notice of removal, which was quickly corrected, the parties generally followed that rule with respect to Enrico until he reached the age of majority and chose to use his full name in public filings, waiving any further right to privacy as to his name. With respect to the other students who allegedly assaulted Enrico, however, the parties have failed to follow this requirement.

It is not entirely clear whether Rule 5.2 strictly applies to discussing individuals who were minors at the time of the events at issue but have since reached majority, as some—but perhaps not all—of the other students likely have here. Under the circumstances of this case, however, where the other students are not parties to this case and are accused of serious misconduct at a time when they were minors, disclosure of their names in public filings violates at least the spirit of Rule 5.2, as well as the spirit of the requirement to seal juvenile delinquency records under 18 U.S.C. § 5038.

Accordingly, the Court hereby SEALS sua sponte the following documents: CVUSD's notice of removal (dkt. 5), where Exhibit E includes the other students' names; the declaration of Seth Gordon (dkt. 76-1) in support of the present motion, where Exhibit B includes the other students' names; Enrico's opposition brief (dkt. 77); and the declaration of EmilyRose Johns (dkt. 78), where Exhibit A includes the other students' names. To complete the public record, the parties are ORDERED to carefully review those documents and file new versions of them redacting the other students' names no later than September 30, 2021. If the parties are aware of any other publicly filed documents that include the names of individuals who were minors during the events at issue, or any other information protected by Rule 5.2, they shall file notice and request to seal any such documents at their earliest opportunity.

This order is not intended to excuse the alleged conduct at issue, but instead to comply with the general principle that courts do not provide public records of actual or alleged juvenile misconduct.

## V.     REMAND

CVUSD removed this case based on Enrico's claims under federal law, neither of which survives this order. Neither party has identified any basis for this Court's jurisdiction over his remaining claims under state law other than supplemental jurisdiction under 28 U.S.C. § 1367(a). Under subsection (c) of that statute, however, a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if," among other reasons, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). A district court's discretion to decline to exercise supplemental jurisdiction over state law "is informed by the *Gibbs* values 'of economy, convenience, fairness, and comity.'" *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, (1966)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This order disposes of all claims within this Court's original jurisdiction.  As stated at the hearing, CVUSD supports the usual approach of remand to state court.  Enrico's counsel argued at the hearing that the Court should nevertheless retain jurisdiction over his state law claims because the case has largely been litigated in federal court, the parties have prepared for a trial in federal court, and Enrico has relied on the January 2022 trial date that this Court previously set.  Counsel provided no examples of work that was already performed solely due to a federal venue and that would not have been required in state court, or that would be required in state court upon remand but not required if the case remained here.  While there may be some delay in setting a trial date if the case is remanded, the backlog of cases to be tried in this district and ongoing restrictions due to the COVID-19 pandemic engender serious doubt as to whether the case could be tried on the dates currently set even if it remained in this Court.  The potential for further delay if the case is remanded is therefore speculative, and it does not outweigh the concerns for comity and judicial economy that favor remanding state claims to state court.  The case is therefore REMANDED.

## VI.    CONCLUSION

For the reasons discussed above, CVUSD's motion for summary judgment on Enrico's claims under the ADA and Section 504 is GRANTED for failure to exhaust administrative remedies as required by 20 U.S.C. § 1415(*l*).  The Court does not reach the parties' arguments regarding deliberate indifference.  The case is REMANDED to the California Superior Court for the County of Alameda for all further proceedings.

To complete the public record, the parties are ORDERED to file new public versions of the documents addressed above in Section IV, redacting the names of other students who were minors during the events at issue, no later than September 30, 2021.

**IT IS SO ORDERED.**

Dated: September 23, 2021

JOSEPH C. SPERO
Chief Magistrate Judge

22